UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Marathon Petroleum Company, LP,                    Case No. 3:16-cv-2694

        Plaintiff

    v.                                                         MEMORANDUM OPINION
                                                                    AND ORDER

Noil Petroleum Corporation,

        Defendant

## I.    INTRODUCTION

Plaintiff and Counter-Defendant Marathon Petroleum Company, LP moves for summary judgment on both its claims and those asserted against it by Defendant and Counter-Claimant Noil Petroleum Corporation. (Doc. No. 48). Third-Party Defendant MPC Investment LLC also moves for summary judgment on Noil's claims asserted against it. (Doc. No. 49). Noil filed a memorandum in opposition to both of these motions, (Doc. No. 53), and Marathon and MPC each filed a reply. (Doc. Nos. 55 & 56).

## II.    BACKGROUND

On August 23, 2016, Marathon and Noil executed[1] a Sales Agreement (the "Marathon Contract") under which Marathon agreed to sell Noil 40,000 barrels of slurry oil at a price of the "[a]verage of Platt's U.S. Gulf Coast 3% Sulfur No. 6 Fuel Oil mean posting effective on August 23, 24, and 25, 2016, plus $0.42 per barrel." (Doc. No. 4-1 at 2). Pursuant to the Marathon Contract,

---

[1] Adam P. Lauth signed the Marathon Contract on behalf of Marathon. (Doc. No. 4-1 at 2). On the Marathon Contract, he is identified as a "trader" for MPC, Marathon's general partner. (*Id.*).

Marathon would deliver the slurry by barge from its refinery in Garyville, Louisiana to Magellan Marrero, Louisiana between August 23 and 25, 2016. (*Id.*).

On August 25, 2016, two barges of Marathon slurry arrived at the Magellan Terminal, but no storage tank was available. Because the slurry could not be unloaded into a storage tank, the slurry sat in the Marathon-chartered barges in the Mississippi River while Noil attempted to find a solution to the problem. Eventually, on August 31, 2016, Noil arranged for a transfer of Marathon's charter to the barges with Genesis Marine. At this time, possession and title to the slurry transferred from Marathon to Noil.

This complication caused a ripple effect since Noil had already agreed to resell the Marathon slurry to Althea Petroleum. The agreement between Noil and Althea was memorialized in a contract (the "Althea Contract") executed one day prior to the Marathon Contract. In the Althea Contract, Noil agreed to sell "1,890,000 GALLONS TWICE WEEKLY … PER 52 WEEKS" to Althea for a spot price of $0.95 per gallon, which was "[s]ubject to change based on CME GULF COAST NO. 6 FUEL OIL 3.0 % PLATTS FUTURES." (Doc. No. 4-2 at 2). The slurry was to be shipped by chartered barge from a storage facility in Garyville, Louisiana to Houston. (*Id.* at 2-3). This did not contemplate the fact that, under the subsequently-executed Marathon Contract, the slurry would be delivered to Noil in Magellan Marrero, Louisiana rather than shipping directly from the Marathon facility in Garyville, Louisiana.

In any case, because of the delay in transferring the slurry from Marathon to Noil, Noil was not able to timely deliver the first load of slurry to Althea. As a result, Althea terminated the Althea Contract. Subsequently, Noil sold the slurry to Davison Petroleum Supply, LLC on September 2, 2016, for $1.3 million dollars – less than Noil would have received from Althea.

Meanwhile, on September 1, 2016, Marathon invoiced Noil $1,482,346.54 for the slurry, which Noil failed to pay. Therefore, on November 3, 2016, Marathon filed suit alleging a claim of breach of contract or, alternatively, unjust enrichment. (Doc. No. 1-1).

In response, Noil asserted counterclaims of breach of contract, fraudulent misrepresentation, negligent misrepresentation, and tortious interference with a business expectancy. (Doc. No. 4). Noil's counterclaims are based upon its allegations that Marathon agreed to secure storage for the slurry at the destination.

### III.   STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

### IV.   DISCUSSION

The parties agree that Ohio law governs the tort and contract claims asserted in this action.

**A.   BREACH OF CONTRACT CLAIM AND COUNTERCLAIM**

Marathon and Noil each allege the other breached the Marathon Contract. In Ohio, "[a] cause of action for breach of contract requires the claimant to establish the existence of a contract,

3

the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018) (citations omitted).

1.   **Marathon's Claim**

Marathon contends it is entitled to summary judgment on its breach of contract claim because Noil accepted and resold the slurry and, thus, breached the Marathon Contract by failing to pay for it. I agree. There is no evidence to suggest Noil made any attempt to reject the slurry or terminate the Marathon Contract. As such, by taking possession of the slurry and reselling it rather than rejecting it, Noil "accepted" the slurry under Ohio law. O.R.C. § 1302.64(A). By failing to pay Marathon for the accepted slurry, Noil breached the Marathon Contract. O.R.C. § 1302.83(A)(1). Therefore, Marathon is granted summary judgment on its breach of contract claim and is entitled to recover the price of the slurry.

2.   **Noil's Counterclaim**

Noil's breach of contract claim rests on whether Marathon was required to secure a storage tank for the slurry at its destination – the Magellan Terminal. Relying on Ohio statutory law, Marathon contends that because the Marathon Contract states "FOB Buyer Facility," it was Noil's obligation to ensure storage was available at the Terminal.

The Ohio Revised Code provides that, "[u]nless otherwise agreed the term F.O.B. (which means 'free on board') at a named place … is a delivery term under which…when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in section 1302.47 of the Revised Code." O.R.C. § 1302.32(A)(2). In turn, section 1302.47 states,

> (A) Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable the buyer to take delivery. The manner, time, and place for tender are determined by

4

> the agreement and sections 1302.01 to 1302.98, inclusive, of the Revised Code, and in particular:
> …
> (2) unless otherwise agreed the buyer must furnish facilities reasonably suited to the receipt of the goods.

O.R.C. § 1302.47(A).

Noil alleges these general principles should not apply because the parties "otherwise agreed" twice. First, Noil contends there was an alternate agreement as to the FOB because the Marathon Contract states "FOB Buyer Facility" even though Noil's "facility" is in Chicago and the shipment's contractual "Destination" is "Marrero, LA." And second, Noil claims the two "otherwise agreed" as to who was supposed to secure storage for the slurry once it arrived at the destination – or furnish facilities reasonably suited for the receipt of goods. Both arguments must fail.

In its first argument, Noil essentially urges me to find that the Marathon Contract is ambiguous since "the parties clearly intended that Marathon deliver the slurry to Magellan in Marrero" rather than Chicago, and yet, the Marathon Contract stated: "FOB Buyer Facility." (Doc. No. 53 at 8-9). Noil contends that because of this alleged ambiguity, the Marathon Contract should be construed against its drafter, Marathon. While Noil is correct that ambiguities should be resolved in favor of the non-drafting party, "'it is equally well settled that a court cannot create ambiguity in a contract where there is none. Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation.'" *Smith v. Erie Ins. Co.*, 69 N.E.3d 711, 717 (Ohio 2016) (quoting *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008)) (further citation omitted). Endorsing Noil's argument would require me to read ambiguity into the Marathon Contract that does not exist. From a plain reading of the Marathon Contract, and in light of the parties' "clear intent" to deliver the slurry to the Magellan Terminal, reasonable minds can come to only one conclusion – Marathon was to deliver the shipment to a specified Noil facility -- Marrero, Louisiana.

5

Noil next argues the parties "otherwise agreed" that Marathon rather than Noil would secure a storage tank at the Magellan Terminal.[2] This argument is based upon conversations that allegedly occurred prior to execution of the Marathon Contract. Specifically, Noil CEO Morrell Steve Neely contends he "fully expected that Althea could pick up the slurry directly from Marathon—either a Marathon barge or Marathon-controlled storage tank—without the expense of renting storage facilities" based upon representations from Adam Lauth that "Marathon would deliver the slurry from a storage tank at the Magellan Midstream Partners' facility in Marrero, Louisiana." (Doc. No. 54 at 3-4, ¶¶ 8 & 9).

But, as noted by Marathon, these alleged representations are excluded by the parol evidence rule. The Ohio statutory parol evidence rule provides that,

> [t]erms…set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented…by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

O.R.C. § 1302.05(B). Noil objects to the application of the parol evidence rule, arguing that the Marathon Contract was not intended as a "final expression of their agreement." (Doc. No. 53 at 11-12). But the Marathon Contract explicitly states, "This Agreement contains the entire agreement of the parties with respect to its subject matter." (Doc. No. 4-1 at 4). Because there is no evidence to the contrary, I conclude the Marathon Contract is the complete and exclusive statement of the terms of the single transaction and may not be supplemented or contradicted by parol evidence.

---

[2] Noil briefly contends that "Neely informed Lauth that Noil Petroleum or its customer would have a barge to accept the oil slurry from Marathon, satisfying § 1302.47(A)(2)." (Doc. No. 53 at 10). But even if using this statement in this way was not barred by the parol evidence rule, there is no evidence that Noil or Althea had a barge awaiting the shipment or that Marathon rejected a barge-to-barge transfer proposal. Therefore, this statement is irrelevant since there is no evidence that satisfied the requirements of O.R.C. § 1302.47(A)(2). Further, it may be considered detrimental to Noil's case in that Noil was aware of the need to procure barges to, at the very least, timely ship the slurry from the Magellan Terminal to Althea in Houston and failed to do so.

Had Noil wished to incorporate the additional obligation that Marathon secure a storage facility at the Magellan Terminal, it should have done so prior to executing the Marathon Contract. Because it did not, and because the Marathon Contract is the complete and exclusive statement of the parties' agreement, Noil is barred from supplementing the terms of the Marathon Contract with parol evidence. As such, Marathon is granted summary judgment on Noil's breach of contract claim.

B.     **MISREPRESENTATION COUNTERCLAIMS**

Noil's claims of fraudulent and negligent misrepresentation are similar to its breach of contract claim. Noil again alleges that, prior to executing the Marathon Contract, MPC trader Adam Lauth represented that Marathon would deliver and discharge the barrels of slurry to a tank in the Magellan Terminal by August 25, 2016, where it could be immediately resold.[3] (Doc. No. 4 at 19-21). Noil claims that these representations were fraudulent and negligent because Marathon and MPC knew or should have known the slurry could not be timely discharged because there was no available storage at the terminal. (*Id.*).

---

[3] In its memorandum in opposition, Noil briefly argues Marathon also made a fraudulent misrepresentation regarding the intent to enter into a long-term supply relationship with Noil. (Doc. No. 53 at 12-13). But this was not alleged in the original complaint, (Doc. No. 4), and Noil "may not expand [its] claims to assert new theories for the first time in response to a summary judgment motion." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 689, 666 (6th Cir. 2012) (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)). Even so, this claim would fail as a matter of law since Noil could not have justifiably relied on a long-term supply deal with Marathon that did not comply with the statute of frauds since such a deal would be unenforceable. *See Olympic Holding Co., L.L.C. v. ACE Ltd.*, 909 N.E.2d 93, 94 (Ohio 2009) ("Agreements that do not comply with the statute of frauds are unenforceable."); *see also Doe v. SexSearch.com*, 551 F.3d 412, 417-18 (6th Cir. 2008) (Justifiable reliance is an element of negligent and fraudulent misrepresentation).

Marathon argues that like the breach of contract claim, the parol evidence rule bars these claims because they derive from alleged representations made prior to the execution of the Marathon Contract.[4] I agree.

Found in both statutory and common law, "[t]he parol evidence rule is a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of alleged or actual agreements." *Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank*, 662 N.E.2d 1074, 1080 (Ohio 1996) (citation omitted); *see also Williams v. Spitzer Autoworld Canton, LLC*, 913 N.E.2d 410, 415-16 (Ohio 2009). "Because the parol evidence rule is substantive in nature[, it is] not limited in application to contract claims[.]" *Williams*, 913 N.E.2d at 416 (applying the parol evidence rule to statutory claim); *see, e.g. Ed Schory*, 662 N.E.3d at 1080-81 (applying the parol evidence rule to negligent misrepresentation claim).

Parol evidence may be considered in some circumstances to prove fraudulent inducement. *See Galmish v. Cicchini*, 734 N.E.2d 782, 790 (Ohio 2000). "But, a fraudulent inducement case is not made out simply by alleging that a statement or agreement made prior to the contract is different from that which now appears in the written contract." *Id.* (quotation omitted). Instead, "the proffered evidence of fraud must show more than a mere variation between the terms of the written and parol agreement." *Id.*

---

[4] Marathon also introduces an alternative argument with respect to the claim of negligent misrepresentation. (Doc. No. 48-1 at 11- 12; Doc. No. 55 at 13-14). Specifically, Marathon contends a "special relationship" is required to prove the duty element of negligent representation and, because this was a typical business relationship rather than a "special relationship," no duty exists here. (*Id.*). But contrary to Marathon's argument, the Supreme Court of Ohio has not imposed this requirement and it is far from settled law. *See Hodell-Natco Indus., Inc. v. SAP Am., Inc.*, 13 F. Supp. 3d 786, 797 (N.D. Ohio 2014) (citing *Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Products, Inc.*, No. 2:02-cv-1288, 2007 WL 894833, at * 9-*12 (S.D. Ohio Mar. 22, 2007) (fully reviewing the state of the law on this issue to explain how a "special relationship" contemplated by *Picker Int'l, Inc. v. Mayo Found.*, 6 F. Supp.2d 685, 689 (N.D. Ohio 1998) is not an element of negligent misrepresentation)). Because summary judgment on the negligent misrepresentation claim is granted on other grounds, I need not and decline to consider this unsettled point of law at this time.

Here, Noil's claim is based on representations which would merely supplement the Marathon Contract with an additional delivery term for this slurry shipment. Because these representations show nothing more than a variation from the written terms of the Marathon Contract, this parol evidence may not be proffered to show fraud. Like the breach of contract claim, had Noil sought to incorporate these alleged representations into the Marathon Contract prior to execution, it should have done so. Because it did not, Noil may not now use this parol evidence to show negligent or fraudulent misrepresentation. Therefore, Marathon and MPC are granted summary judgment on these claims as a matter of law.

C. **TORTIOUS INTERFERENCE**

Finally, Noil contends Marathon tortuously interfered with a business expectancy because Althea terminated the Althea Contract after becoming "[f]rustrated by the failed delivery" of the first shipment of slurry. (Doc. No. 54 at 4). Essentially, Noil contends that because Marathon did not secure a storage tank at the facility (or did not ship it to Althea directly), the shipment was delayed. And because the shipment was delayed, Althea terminated the Althea Contract.

As an initial matter, because this claim ultimately derives from the same alleged representations regarding Marathon's provision of the storage tank discussed above, it must fail as a matter of law under the parol evidence rule. But even if the statements offered by Noil could be used to show Marathon breached the Marathon Contract, Noil's claim here would fail because Noil cannot establish two other necessary elements.

"The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995). "The main distinction between tortious interference with a contractual

9

relationship and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract." *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775, 780-81 (Ohio Ct. App. 2002).

Although Noil characterizes its claim as one of tortious interference with a prospective business relationship, it identifies only its relationship with Althea. (Doc. No. 53 at 15-16). Because the only identified relationship was reduced to a contract, this claim is actually one of tortious interference with contract rather than tortious interference with a prospective business relationship.[5] Therefore, to survive summary judgment on this claim, Noil must set forth sufficient evidence of the following elements:

> (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.

*Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999) (citing *Kenty v. Transam. Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995)).

In support of this claim, Noil again relies on Neely's statement that "Lauth was aware that Noil was negotiating an extended supply contract with at least one of its customers to supply that customer with oil slurry." (Doc. No. 54 at 1). Lauth disputes this allegation, stating he did not learn of Noil's intent to resell the slurry until much later. (Doc. No. 48-2 at 4). This is corroborated by an email Lauth sent at the time he learned of this intent. (*Id.* at 11).

---

[5] "A claim for a tortious interference with a business relationship requires proof of (1) the existence of a business relationship; (2) the wrongdoer's knowledge of the relationship; (3) an intentional interference causing a breach or termination of the relationship; and (4) resulting damages." *WLB Radiology, LLC v. Mercy Health N., LLC*, 69 N.E.3d 1032, 1042-43 (Ohio Ct. App. 2016) (citations omitted). Noil provides no evidence that any other business relationship existed let alone that Marathon knew of such a relationship and intentionally interfered with it. In any case, Noil is unable to prove the common elements of these two claims.

But even taking Neely's statement as true, the statement fails to show that Lauth knew of Noil's relationship and contract with Althea. In turn, since there is no evidence that Lauth knew of the Althea Contract, there is no evidence that he knew of contents of that contract – including the delivery date of the slurry from Noil to Althea. Because Marathon and MPC, through Lauth, had no knowledge that Noil was contractually required to deliver the resold slurry to Althea immediately after the scheduled receipt, there is no basis for a finding that Marathon and MPC intentionally procured a breach of the Althea Contract, effectively terminating the relationship between Noil and Althea.

Because there is no evidence by which a reasonable jury could find Marathon knew of the Althea Contract or intentionally interfered with it, Marathon and MPC are granted summary judgment on this claim.

### D. DAMAGES

Marathon also moves for summary judgment on Noil's final counterclaim seeking a declaratory judgment as to the price term of the Marathon Contract. The Marathon Contract states the price of the slurry was to be the "[a]verage of Platt's U.S. Gulf Coast 3% Sulfur No. 6 Fuel Oil mean posting effective of August 23, 24 and 25, 2016, plus $0.42 per barrel." (Doc. No. 4-1 at 2). When invoicing Noil, Marathon used the average of "Platt's US Gulf Coast Waterborne 3% Sulfur No. 6 Fuel Oil." Noil contends that, based upon conversations with Lauth prior to execution of the Marathon Contract, it believed the price would be calculated using the "CME Gulf Coast No. 6 Fuel Oil 3.0% Platts Futures." Further, Noil argues the Marathon Contract is ambiguous because it does use the word "Waterborne."

For the reasons discussed above, parol evidence, like the conversations with Lauth that Noil relies upon here, is barred. Therefore, the only remaining question is whether the Marathon Contract's price term was ambiguous. I conclude it is not. The omission of the term "Waterborne"

alone does not result in ambiguity. The price index Noil seeks to apply is not only dissimilar in name, but calculation of the price on this index would also be at odds with the remaining terms of the Marathon Contract, requiring the average mean posting of the three days at issue. Therefore, I once again reject Noil's request to create an ambiguity in the Marathon Contract where none exists and grant Marathon summary judgment on Noil's declaratory judgment of price calculation claim.

Based on my analysis above, I find Noil owes Marathon $1,482,346.54, as invoiced, in contract damages for the breach of contract claim. (Doc. No. 48-2 at 22). Further, since the Marathon Contract is governed by Ohio law, Noil owes prejudgment interest in the amount of $212,469.67.[6] *See, e.g., Quest Workforce Solutions, LLC v. Job1USA, Inc.*, 119 N.E.3d 817, 825-26 (Ohio Ct. App. 2018) ("In contract cases, the prevailing plaintiff is entitled to prejudgment interest as a matter of law.").

Finally, the Marathon Contract provides that "[i]f Seller does not receive payment when due, …and…suit is filed thereon, Seller will be entitled to attorney fees and court costs." (Doc. No. 4-1 at 3). In accordance with this provision, I hereby award Marathon $350 in court costs. (Doc. No. 48-4 at 3). But, while I recognize Marathon's contractual right to recover attorney fees, I find the level of detail provided insufficient to award Marathon the fees as requested at this time.

---

[6] "Prejudgment interest accrues on a contract claim from the time that the money due to the plaintiff should have been paid." *Quest Workforce Solutions, LLC*, 119 N.E.3d at 825. In this case, the invoice indicates $1,478,194.78 was due by September 4, 2016 (net 3 days of the invoice date – September 1, 2016). (Doc. No. 48-2 at 22). But the invoice ultimately states $1,482,346.54, including the slurry price and contractually-owed reimbursement for environmental fees, (*id.* at 8), was the "amount due by" September 6, 2016. (*Id.* at 22). Because the plain language of the invoice states the total of $1,482,346.54 was due by September 6, 2016, prejudgment interest must be calculated from September 7, 2016, through the date of this opinion.

The annual interest rate used to calculate prejudgment interest is the "federal short-term rate" rounded to the nearest whole percent plus three percent. *See* O.R.C. §§ 1343.03(A), 5703.47. Here, the applicable interest rates were as follows: 3% in 2016, 4% in 2017, 4% in 2018, and 5% in 2019. As such, Noil owes the sum of the following: (3%*$1,482,346.54)*(116/366) in 2016, (4%*$1,482,346.54) in 2017, (4%*$1,482,346.54) in 2018, (5%*$1,482,346.54) in 2019, and (5%*$1,482,346.54)*(28/366) in 2020. 2016 and 2020 are both leap years.

Additionally, in light of the judgment in favor of Marathon, I find Marathon's requested *in camera* review of the detailed accounting unwarranted. Should Marathon wish to collect these attorney fees, it shall supplement the request by February 10, 2020. Noil may then file an objection to such a request by February 17, 2020.

V.     CONCLUSION

For the foregoing reasons, the motions for summary judgment filed by Marathon and MPC are granted. (Doc. Nos. 48 & 49). Because Marathon and MPC are granted summary judgment on all of Noil's counterclaims, the pending motions to dismiss these same counterclaims are denied, as moot. (Doc. Nos. 14 & 20). Noil shall pay Marathon $1,694,816.21 in damages.

After granting MPC and Marathon summary judgment on Noil's counterclaims and granting Marathon summary judgment on its breach of contract claim, all that remains are Marathon's account stated and unjust enrichment claims. In its motion for summary judgment, Marathon seeks voluntary dismissal of these claims. (Doc. No. 48-1 at 7). Noil alleged it would file a cross-motion for summary judgment dismissing these same claims but has not done so. (Doc. No. 53). Given the fact that Noil has no apparent objection to voluntary dismissal of these claims and intended to pursue dismissal itself, I hereby dismiss these remaining claims.

Should Marathon wish to pursue its request for attorney fees, it shall file a detailed accounting by February 10, 2020. Noil may then object to the requested fees by February 17, 2020.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge